## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **DANIEL F. CASH** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No.:** |
| **WILLIAM D. SNYDER, Individually,** | ) | |
| **WILLIAM D. SNYDER, in his Official** | ) | **JURY TRIAL DEMANDED** |
| **Capacity as SHERIFF OF** | ) | |
| **MARTIN COUNTY, FLORIDA** | ) | |
| **MICHAEL FENTON, Individually,** | ) | |
| **MARTIN COUNTY, a political subdivision** | ) | |
| **of the State of Florida.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

## PRELIMINARY STATEMENT

1. This is a Civil Rights Action concerning the extraordinary misconduct of certain police detectives, officers and supervisors of the Martin County Sheriff's Office involving their decisions and actions in covertly installing hidden video cameras in licensed spa businesses in Martin County, Florida and remotely viewing and recording hundreds of spa customers undress and receive massages or other spa services, whom the police had no reasonable suspicion to believe had or would commit a crime. These customers were unaware that dozens of police personnel were watching them undress. Later the police released intimate descriptions of these customers' bodies including their genitalia, and a vivid detailed description of the massage given to them along with photos of the customers and their residential addresses to various individuals and companies.

1

2. Plaintiff, DANIEL F. CASH was one such customer whose naked body and genitalia was viewed and recorded by the members of the Martin County Sheriff's Office without his knowledge and consent. These officers, including Defendants FENTON and SNYDER, allowed nonessential as well as unauthorized individuals to view this massage or details of the massage. FENTON and SNYDER later authorized the release of intimate details of the Plaintiff's body, his massage, along with the Plaintiff's photo and residential address to members of the public and various media companies.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this Complaint under 42.U.S.C.§1983 and 28 U.S.C. §1331, 1343(a)(3), 1343(a)(4) and 1367(a).

4. Venue is properly with this District pursuant to 28 USC§1391 as Defendants FENTON and SNYDER reside in Martin County, Florida and the actions at issue occurred in Martin County, Florida.

## PARTIES

5. Defendant, MARTIN COUNTY is a subdivision of the State of Florida existing under the laws of the State of Florida and maintains certain control over, and direction of, the Sheriff of Martin County, WILLIAM D. SNYDER and Sheriff Department employees including Defendant, MICHAEL FENTON.

6. Defendant, MICHAEL FENTON (hereinafter referred to in this Complaint as "FENTON"), was at all times relevant to this Compliant employed as a detective in the Martin County Sheriff's Department. He is sued in his individual capacity.

7. Defendant, WILLIAM D. SNYDER (hereinafter referred to in this Complaint as "SNYDER"), was at all times relevant to this Complaint, the Sheriff of Martin County,

Florida. As Sheriff he is the final policymaker for the County with respect to law enforcement related matters.   He is sued in both his individual as well as official capacity as Sheriff of Martin County.

8.  At all times relevant to this complaint, FENTON and SNYDER and other Sheriff's office employees, acted in concert and were jointly and severally responsible for the harm caused to Plaintiff.

9.  At all times relevant to this Complaint, FENTON and SNYDER acted under color of state law.

## FACTUAL ALLEGATIONS

10. On or about October 8, 2018, Plaintiff entered a commercial business in Martin County for the purpose of receiving a massage. This business was licensed to provide massages and other spa services. Plaintiff paid the standard price this business posted as their customary massage rates for this service.

11. The Plaintiff did not ask, negotiate, nor pay for any form of illegal massage or sexual act. His masseuse was properly licensed to provide this massage.

12. In preparation for his massage the Plaintiff entered a massage room, closed the door and completely disrobed in preparation for the massage.

13. At all times during Plaintiff's massage, and his undressing, the massage room door was closed and no one other than his masseuse was in the room with him.

14. Neither Plaintiff nor the masseuse knew that hidden in the ceiling tiles above the massage table was a camera that captured color video of the Plaintiff undressing. This video included images of Plaintiff's naked body, his genitalia, and his massage.

15. At no time did either the Plaintiff or the masseuse give consent to anyone to watch or film what occurred in this massage room.

16. Unbeknownst to the Plaintiff once he entered the massage room all actions within this massage room, including his massage and the exposure of his naked body, was being remotely transmitted through this hidden camera to a room within the Martin County Sheriff's Office where the entirety of what occurred in the massage room was viewed by a group of individuals including FENTON. The Plaintiff's disrobing in the massage room, including his massage, was recorded on a computer and saved at the direction of FENTON and SNYDER.

17. Several months after this massage, SNYDER, as Sheriff of Martin County, held a widely attended press conference wherein he announced that his department was in the process of arresting hundreds of men, all customers of two Martin County massage businesses, (including the business which provided the massage to the Plaintiff). The Sheriff alleged that these men had committed crimes relating to prostitution during their massage.

18. In this press conference SNYDER characterized these men as "Monsters," accusing them of facilitating the crime of human trafficking of the women who worked in the spas. SNYDER had no evidence to support either accusation.

19. News media from around the country featured this press conference, and SNYDER'S comments in stories printed and broadcast.

20. In the ensuing days after this press conference the Plaintiff was arrested and charged with the misdemeanor crimes of soliciting prostitution and the use of a structure for prostitution.

21. After his arrest FENTON and SNYDER released to the public, and to various news companies, a photo of the Plaintiff's face, his residential address, and a detailed report of the Plaintiff's disrobing and receiving his massage - which included descriptions of the Plaintiff's genitalia and other intimate vivid details regarding what parts of his body was massaged and his bodily reaction to such massages. The media has used this photo of the Plaintiff in stories regarding the Sheriff's investigation as well as details of his arrest. At least one such media report linked the Plaintiff's photo and arrest to FENTON and SNYDER'S false claims that those arrested facilitated the crime of human trafficking.

22. Following Plaintiff's arrest he learned that Martin County Sheriff's Office had surreptitiously viewed and recorded his disrobing, massage, and his naked body. The Sheriff vowed to use this and other tapes in the prosecution of the Plaintiff and other customers. He also vowed to release these tapes to the public and media as a "Public Record."

23. The Plaintiff pleaded not guilty to both charges and before trial the Prosecutor chose to dismiss both charges against the Plaintiff.

24. The hidden video camera which broadcast Plaintiff's massage to the Sheriff's Department room was installed covertly by, or at the direction of, FENTON, a Martin County Sheriff's Office detective.

25. FENTON installed this camera, and helped design and implement the plan to install hidden cameras in several other massage rooms of the two licensed spa businesses in Martin County, in order to view and record every massage which occurred in those rooms during an extended period of time.

26. Before FENTON covertly installed these cameras, and before the massage of the Plaintiff was viewed and recorded, FENTON communicated his intentions and his plan to covertly view and videotape spa customers' massages, to his supervisors, including SNYDER. Neither FENTON nor SNYDER nor any other supervisor of FENTON'S had particularized probable cause or even reasonable suspicion that the Plaintiff would engage in any criminal act on the day he entered the massage room, nor on that date did either FENTON nor SNYDER have any particularized probable cause or suspicion to believe that the crime of human trafficking was occurring in the business that provided the Plaintiff's massage.

27. FENTON's supervisors, and SNYDER, approved FENTON's plan to view and tape every massage occurring in these two businesses for a period of time of almost three continuous weeks, despite the fact that these officers and Defendants knew or should have known that in light of pre-existing case law governing the Constitutional right to bodily privacy, the viewing and recording of citizens undressing and being massaged by another was improper, unlawful, and a violation of the U.S. Constitutional rights to privacy as guaranteed by the 4th and 14th Amendments.

28. In total, between the two spa businesses FENTON targeted, FENTON and other officers of the Martin County Sheriff's Office viewed and video recorded over 240 massages of customers – male and female, including the Plaintiff. None of these customers knew of the covert camera in their massage room, or of the remote viewing by strangers of their naked bodies. None of the customers consented to being viewed or recorded.

29. With FENTON and SYNDER'S knowledge and approval, over 60 individuals were allowed to participate in the viewing or recording of these massages. These individuals

included FENTON's supervisors as well as SNYDER, and many other individuals not associated with the Martin County Sheriff's Office. Several of these people were not sworn police officers.

30. Detective FENTON installed the video cameras in the spa businesses after applying for a Court Order to covertly enter the businesses for the purpose of installing the cameras and monitoring the massage rooms.

31. In his Affidavit submitted to the Court seeking this authorization, FENTON misstated or omitted important facts for the purpose of persuading the judge to grant permission to install these cameras and view these massages. The misstatements and omissions include:

    a) FENTON'S level of experience in investigating the crimes of prostitution, money laundering and deriving support through prostitution.

    b) The need to view and record massages in order to determine whether crimes were being committed inside the spa businesses. FENTON did not advise the judge that there existed well known, and highly successful, less intrusive police procedures for such investigations. These well-known investigative alternatives would not have invaded the privacy of customers, in that they do not include visual surveillance of citizens in a state of undress or receiving a massage..

    c) That the intended placement of the cameras would necessarily reveal customers disrobing and exhibiting their naked bodies and their genitalia to the camera.

d) That a substantial period of the time would occur where no law enforcement officer would be available to view contemporaneously the massage room camera feeds.

e) That FENTON and SNYDER'S true intention was to blanket-record all massages occurring in those rooms regardless of whether the customer was a man, woman or child. The Defendants intended to view these recordings at a later date in time.

f) That the spa had female customers who were not believed to be participants in any criminal acts, and those women would likewise be viewed and recorded as they undressed and received spa services.

g) That neither FENTON nor SNYDER had any reasonable suspicion or probable cause to suspect any particular customer would commit any crime within the massage rooms being surveilled.

h) FENTON claimed in his affidavit that he had read, was familiar with and would be governed by, several specific federal judicial opinions relating to electronic surveillance. In truth, FENTON had not read nor was he familiar with the holdings from any of the cases he cited. The cases he cited set forth governing standards regarding the application and the use of covert video surveillance.

i) That FENTON and SNYDER'S reasons provided to the Court for the authorization to install and monitor hidden cameras was pretextual. The true reason the Defendants wanted to install the cameras and to record the massages was to facilitate and create a massive arrest of citizens for

alleged misdemeanor crimes relating to prostitution, and to ballyhoo this police operation into a widely promoted press conference and news event.

32. Had FENTON accurately informed the Court of his limited experience in investigations, his lack of knowledge of relevant case law, and that other well-known police investigative techniques existed to detect these crimes which didn't include the use of covert camera viewing, his true intentions to video record every customer's spa treatment, and to use the recordings as evidence to support a massive arrest of hundreds of customers, the Court would have refused FENTON's request to install the cameras. The issuing Court would have concluded that there was an insufficient nexus between the supporting evidence FENTON cited in his Affidavit, in contrast to the seriousness of the alleged crimes to warrant allowing the requested electronic surveillance.

33. FENTON, his supervisors and SNYDER, all knew before FENTON's application to the Court to covertly install these cameras that:

   a) The true objective of viewing and recording these massages was to create a high profile criminal case, based upon the arrest of hundreds of men for misdemeanor crimes alleged to involve prostitution, so that the Sheriff and his Department would receive favorable media publicity.

   b) Individuals receiving massages in those businesses would be completely unclothed, and that these customers enjoyed the protection of the U.S. Constitution's right against unreasonable search and seizures and a citizen's right to bodily privacy pursuant to the 4th and 14th Amendments to the Constitution.

c) Before any viewing of spa customers began, the Constitutional right to privacy was clearly established by Court decisions throughout the land, including decisions from the U.S. Supreme Court as well as the 11th Circuit Court of Appeals and Florida Supreme Court. This decisional law applied with obvious clarity to the specific conduct intended and accomplished by FENTON and SNYDER, ie, the viewing and recording of citizens disrobing and receiving a massage in a commercial establishment.

d) That based on these Court decisions, as well as common sense and a fundamental concepts of decency, the proposed viewing and recording of an individual's naked body and genitalia was outrageous, shockingly improper, degrading and an egregious humiliation to the spied on citizens - such that no reasonable police officer would have believed such acts were lawful.

34. Despite this knowledge of the unlawfulness of their intended plan to view and record every massage and release intimate details of the massages to the public, FENTON, his supervisors and SNYDER nonetheless went ahead with their plan.

35. FENTON's request for a Court Order to install cameras and monitoring was granted. (See attached Exhibit "1")

36. This Court authorization was facially invalid as well as defective, due to not only pre-existing decisional law widely known by reasonable police officers, but also because of the misstatements and omissions that FENTON presented to the Court in his Affidavit.

37. This Court authorization, however, came with certain limitations and restrictions on what the police could and couldn't do.

38. The restrictions and limitations in the Court Order included:

   a) "While monitoring the premises to be searched, the Sheriff shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the Affidavit."

   b) "The Sheriff shall also make efforts to minimize the disclosure of this surveillance operation to only these sworn law enforcement officers pertinent and relevant to this surreptitious investigation…"

   c) "…and to make return of your doings upon executing this warrant which you are hereby commanded to execute as the law directs…"

   d) Despite FENTON and SNYDER'S request for the Court to grant them permission to record disrobing and massages, the Court refused this request.

   e) Nor did the Court authorize FENTON or SNYDER to release vivid details of a customer's body or massage to the public or to media companies.

39. Shortly after receiving Court authorization to install the cameras and monitor the massage rooms, FENTON, his supervisors and SNYDER personally received further instructions regarding how to conduct this covert surveillance from the State Attorney for Martin County, Bruce Colton.

40. By the date of Plaintiff's massage, Defendants FENTON and SNYDER were aware that approximately 80 massages had already occurred in the business Plaintiff appeared at. All 80 massages had been viewed and recorded. FENTON and SNYDER concluded that

these 80 videos captured the alleged criminal acts they expected to see. With such evidence there existed at the time of viewing and recording the Plaintiff's massage, no legitimate law enforcement need to view or tape the Plaintiff's massage.

41. Mr. Colton's instructions to FENTON and SNYDER were clear and direct.  His instructions focused on the duty of all Sheriff employees who would be monitoring these cameras to ensure that they minimize the invasion of spa customers' Constitutional privacy rights by how long they watched a massage before turning off the camera.

42. Chief among Mr. Colton's "minimization instructions" to FENTON, his supervisors and SNYDER were:

    a) That before remotely viewing any massage, the viewer must first read FENTON's Affidavit (used to secure Court approval for the covert monitoring) as well as the Court Order which granted FENTON's request.

    b) That viewing of a massage could only occur for a "reasonable period" of time for the sole purpose of determining whether or not a criminal act would occur. Termination of the video feed was required once the monitoring agent witnessed lawful massage treatments to a customer.

    c) Recording of a massage would commence if and when "criminal" conduct was first witnessed by the monitoring agent.

43. FENTON, his supervisors and SNYDER were all well aware of Prosecutor Colton's instructions regarding the need to minimize privacy intrusions of spa customers. FENTON and SNYDER each signed Colton's memorandum verifying they had read Colton's instructions and the Court Order.

44. Despite the Court Order requiring minimization of privacy intrusions, and Colton's instructions regarding same, FENTON, his supervisors and SNYDER ignored both. Instead, FENTON and SNYDER carried forth their original plan of recording each and every massage occurring in each massage room regardless of whether the massage was given to a man or woman. FENTON and SNYDER knew that the unbridled recording of every massage given to a customer was in violation of the Court Order, Prosecutor Colton's instructions, and that their actions also violated the customers' Constitutional rights to bodily privacy as protected by the 4th and 14th Amendments of the U.S. Constitution.

45. By allowing unnecessary and unauthorized individuals to view the Plaintiff disrobe and view his naked body, as well as by FENTON and SNYDER'S decision to record it and release details of the massage to the public and news media, FENTON and SNYDER have exponentially intensified the Plaintiff's embarrassment, fright, humiliation and other emotional injuries.

46. No reasonable police officer in the position of FENTON or SNYDER would have viewed or recorded the Plaintiff disrobing as it was widely known by police officers that the viewing and recording of a citizen disrobing, standing naked, and receiving a massage before a hidden camera violated that citizen's Constitutional right to privacy, nor would a reasonable police officer have released intimate details of the Plaintiff's body and massage to the public and media companies.

47. FENTON and SNYDER had fair warning from binding case law, including the Court Order at issue, that viewing and recording Plaintiff's naked body, and the release of these

intimate details to the public and media companies, violated the Plaintiff's 4th and 14th Amendment Rights to privacy guaranteed by the U.S. Constitution.

48. Approximately 60 individuals signed Prosecutor Colton's instruction memo and watched some or all of the recorded massages. Several of these individuals were not sworn law enforcement officers, or were otherwise unauthorized to view the massages or recordings and thus should not have been allowed by FENTON, his supervisors and SNYDER to view same.

49. SNYDER was aware of how the video surveillance was being conducted by FENTON and his fellow officers, including the bulk recording of massages when no law enforcement officer was present. Yet neither SNYDER, nor FENTON'S supervisors attempted to stop or limit such recording. SNYDER was present during some of the recording of these massages but failed to limit or stop them. SNYDER'S actions and inactions aided, encouraged or assisted his officers in ignoring their obvious and apparent violations of the U.S. Constitution's right to bodily privacy.

50. Subsequent to Plaintiff's arrest, the Honorable Kathleen Roberts, a Judge in and for Martin County, presided over a suppression hearing brought by several spa customers who, like the Plaintiff, were arrested after receiving a massage at one of the two targeted businesses.

51. Judge Roberts granted the Defendant's criminal Motions to Suppress the Videotaped Evidence, ruling that the Martin County Sheriff's officers had violated the spa customers' U.S. Constitutional Rights to privacy. Judge Roberts ruled that the videotaped evidence of the massages were illegally obtained by the police and thus inadmissible as evidence in a criminal prosecution of the customers videotaped. (See Exhibit "2")

52. After Judge Robert's ruling, several other judges in Indian River and Palm Beach Counties ruled similar to Roberts.  All judges found the spa tapings to be violations of customers' rights to privacy guaranteed by the U.S. Constitution.  Recently Florida's Fourth District Court of Appeal unanimously ruled that the use of the hidden cameras similar to that used against Plaintiff violated both Florida law and the Federal Constitutional right to privacy (see Exhibit "3" Court opinion, State v. Robert Kraft, et al).

53.  As a direct and proximate result of Plaintiff's arrest and the release by FENTON and SNYDER of the intimate details of the Plaintiff's massage, along with a photo of his face and his residential address, the Plaintiff was fired from his long standing job, suffering a loss of income of over $200,000.00 per year. The Plaintiff had expected his career to last at least 15 years beyond the date he was summarily fired.  The Plaintiff's good name and reputation and career have all been permanently damaged as a result of these actions, making it unlikely that he will be hired in the profession he once worked.

54. Due to the actions of FENTON and SNYDER, the Plaintiff was ridiculed and ostracized by his former employees and some neighbors.  He was forced to sell his home to avoid the hostile actions of those neighbors.  Because of the damages to his reputation and good name, he was forced to move out of State in the hopes of rebuilding a new life.

**CLAIMS FOR RELIEF**

**COUNT I**

**ILLEGAL VIEWING AND RECORDING OF DANIEL CASH**

**DANIEL F. CASH v. WILLIAM D. SNYDER and MICHAEL FENTON,
in their individual capacities.**

55. The Plaintiff would reallege and readopt all factual allegations contained in this Complaint found in paragraphs 10 through 54.

56. The viewing and recording of Plaintiff's naked body by FENTON and SNYDER was tantamount to an unreasonable "search and seizure" of Plaintiff by FENTON and SNYDER in violation of the protections afforded to the Plaintiff by virtue of the 4th and 14th Amendments to the U.S. Constitution, which granted to the Plaintiff the right to bodily privacy and protected him from unreasonable search and seizures as to that privacy right.

57. FENTON and SNYDER'S viewing and recording of the Plaintiff undressing and his naked body receiving a massage was unreasonable and unconstitutional in at least these respects:

   a) The search and viewing of his naked body was not authorized by State or Federal law and violated the limitations of the Court Order and Colton's instructions regarding the viewing of customer massages.

   b) The execution of the installation order, including the scope and duration of the search and viewing, was excessively intrusive and unnecessary to achieve legitimate law enforcement goals for this investigation.

   c) The search, viewing and recording of the Plaintiff's naked body and his massage bore no rationale relationship to the claimed investigative focus stated by FENTON in his Affidavit to wit: crimes relating to money laundering and deriving the proceeds of prostitution.

d) The search, viewing and recording of Plaintiff's body and massage was unnecessary on the date FENTON and SNYDER viewed and recorded Plaintiff disrobing and receiving his massage because FENTON and SNYDER had already witnessed and recorded approximately 80 massages that the police believed involved prostitution. With this large amount of evidence, FENTON and SNYDER had no further legitimate investigative objective to continue recording any massages including the Plaintiff's.

e) The manner of viewing and recording Plaintiff's massage reflected a complete absence of respect for the Plaintiff's Constitutional right to privacy.

f) FENTON and SNYDER  permitted an unreasonable and unnecessary number of third parties to observe these massages, including individuals who played no role in the investigation, and/or did not meet the Court Ordered requirement as to who was allowed to view these customers in the massage room.

g) By submitting a false, pretextual, incorrect, and incomplete Affidavit to the Court in order to receive permission to monitor these massages, Defendant, FENTON knew he did not have probable cause to justify his intended plan to view these massages but intended to mislead the Court to believe otherwise.

h) FENTON and SNYDER at the time they viewed and recorded Plaintiff's disrobing and massage, had fair warning via binding

decisional case law as well as the Court authority here, and Colton's directions, that their actions relative to viewing and recording citizens disrobing and receiving a massage violated the Plaintiff's Constitutional right to privacy.

58. SNYDER personally took part in the viewing and recording of some of the customer massages and assisted and encouraged others to do likewise.

59. The Plaintiff's mental and physical suffering as well as his past and future loss of income were and are a direct result and proximately caused by these Defendants' unconstitutional acts.

## COUNT II

### ILLEGAL RELEASE OF DANIEL CASH' DETAILS TO PUBLIC AND COMPANIES

**DANIEL F. CASH v. WILLIAM D. SNYDER and MICHAEL FENTON, in their individual capacities.**

60. The Plaintiff would reallege and readopt all factual allegations in this Complaint found in paragraphs 10 - 59.

61. FENTON and SNYDER'S release to the general public and media companies details of the Plaintiff disrobing, his naked body and intimate facts of his massage along with Plaintiff's photo and residential address was unlawful and violated the Plaintiff's Constitutional right to privacy guarding against the disclosure of all such details.

62. That the acts of FENTON and SNYDER, in releasing this information, were shockingly degrading and egregiously humiliating to the Plaintiff causing him severe personal and economic injury. At the time FENTON and SNYDER released these details they knew

or should have known that prior binding decisional case law from the U.S. Supreme Court, and other courts, established that the police were not authorized to publicly disclose information that would constitute an invasion of a citizen's Constitutional right to privacy afforded by the 4th and 14th Amendments to the U.S. Constitution.

63. At the time FENTON and SNYDER released this personal information of the Plaintiff, there existed no legitimate State interest which outweighed the Plaintiff's right to privacy in such information.  Rather FENTON and SNYDER released this private information for the express purpose to fan media interest in this massive arrest and to increase the notoriety of FENTON and SNYDER and the Martin County Sheriff's Department.

## COUNT III

### DANIEL F.  CASH v. WILLIAM D. SNYDER,
### in his official capacity as SHERIFF OF MARTIN COUNTY

64. The Plaintiff would reallege and readopt all factual allegations contained in this Complaint found in Paragraphs 10 through 63.

65. William D. Snyder is an official of local government of Martin County. As the Sheriff of Martin County he is a final policymaker for the County as to matters of investigating crimes and arresting suspected violators.

66. The Florida State Constitution designates a Sheriff as a County officer, and the Sheriff's budget, salary and any judgment against him is paid by the County.

67. The Sheriff's budget is provided by Martin County from taxes levied only within the County.

68. The Sheriff is authorized to purchase liability insurance to cover claims arising out of the performance of his duties as a Sheriff and those of his employees.

73. The violations of Plaintiff's Constitutional rights to bodily privacy under the 4th and 14th Amendment to the U.S. Constitution were directly and proximately caused by the actions and/or inaction of the Defendant, SNYDER, as Sheriff of Martin County with regards to properly train and supervise the officers involved in this investigation.

74. SNYDER, as Sheriff of Martin County encouraged or tolerated the illegal and improper acts and practices of his officers in this investigation and knew that these acts were occurring.

75. SNYDER'S failure to properly hire, retain or discipline these officers in this case after learning of their violations of the law regarding a person's right to bodily privacy were a proximate cause of Plaintiff's injuries.

76. The Plaintiff's mental and physical suffering as well as his past and future loss of income were and are a direct result and proximately caused by SNYDER'S unconstitutional acts including his failures to train, supervise and discipline the officers in this investigation.

## COUNT IV

## DANIEL F. CASH v. COUNTY OF MARTIN, State of Florida

77. The Plaintiff would reallege and readopt all factual allegations contained in this Complaint found in Paragraphs 10 through 76.

78. The Sheriff of Martin County is a branch of the local government; Martin County.

79. A judgment against SNYDER, as Sheriff of Martin County will become the responsibility of the County of Martin to satisfy.

69. A monetary judgment against the Sheriff would not be satisfied with State funds, but instead would be paid by the county.

70. The Sheriff was not acting as an arm of the State of Florida with regards to his actions, and inactions, relating to the covert installation of these cameras, the viewing of these massages by dozens of individuals, and the recordings of these massages.

71. The various acts of FENTON, SNYDER and other Martin County Sheriff's Office officers, in their investigation of this massage case including the installation of covert cameras, their filings of false and incomplete Affidavits to secure Court approval to install the cameras, and how the massages would be viewed, were all acts that William D. Snyder as Sheriff had control over by virtue of his position as Sheriff. He knew of the improper and illegal acts of FENTON and others in this investigation, and FENTON'S disregarding of the limitations of the Court Order, and Prosecutor Colton's instructions. SNYDER ratified or consented to each such improper or illegal act of FENTON or of the Sheriff's Office employees, or agents in this matter.

72. SNYDER, as Sheriff failed to adequately train or supervise his employees including FENTON with respect to teaching them how to conduct an investigation which did not violate an individual's 4th and 14th right to bodily privacy, how to prohibit the release to the public and companies of information which was protected by a citizen's right to privacy under the U.S. Constitution, how to follow the limitations of a Court Order, and instructions imposed by the Chief Prosecutor. Had SNYDER adequately trained or supervised his employees in this case, the Plaintiff would not have received the injuries he sustained.

80. The acts and decisions of SNYDER, in his capacity as Sheriff of Martin County, as set forth in this Complaint constituted illegal and unconstitutional violations of the Plaintiff's rights to bodily privacy under the 4th Amendment to the U.S. Constitution.

81. Martin County is liable for constitutional torts committed by employees of the Martin County Sheriff's Office which occur in the execution of the Sheriff's policy, custom or decisions.

82. SNYDER, as Sheriff, is the final policymaker for law enforcement matters for Martin County, and his inadequate training or supervision of his department's employees during this investigation caused the violation of the Plaintiff's constitutional right to bodily privacy.

83. The Plaintiff's mental and physical suffering, as well as his past and future loss of income, were and are a direct result and proximately caused by SNYDER'S unconstitutional acts.

84. Martin County is responsible for the alleged violations of law of its Sheriff and his employees as set forth in this Complaint.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment to include:

a) Compensatory damages from all Defendants.

b) Destruction of any and all videos and/or reports obtained or created by the Defendants that have given rise to this action.

c) Reasonable attorneys' fees and costs from all Defendants.

d) Such other relief as may appear just and appropriate from all Defendants.

e) Plaintiff's hereby demands trial by jury as to all counts in this Complaint.

DATED this 1st day of September 2020.

/s/ Richard D. Kibbey
RICHARD D. KIBBEY, Esq.
Bar No.: 255149
/s/ Jordan R. Wagner
JORDAN R. WAGNER, Esq.
Bar No: 14852
**KIBBEY | WAGNER, PLLC**
416 SW Camden Avenue
Stuart, FL 34994
kibbeylegal@gmail.com
jwagner@kibbeylaw.com
diana@kibbeylaw.com

19-345W            18-12646

#70

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN AND
FOR THE COUNTY OF MARTIN
STATE OF FLORIDA

## ORDER FOR SURREPTITIOUS ENTRY AND INSTALLATION OF ELECTRONIC SURVEILLANCE CAMERA

2019 FEB 26  AM 11:07
FILED FOR RECORD
MARTIN CO., FL

IN THE NAME OF THE STATE OF FLORIDA, TO ALL AND SINGULAR:

The Sheriff of Martin County and his lawful deputies, all police officers having jurisdiction over the premises to be searched / surveilled in Martin County, Florida, any State Attorney Investigator,

WHEREAS, application in writing, supported by affidavit of a credible witness, or witnesses, has this day been made before the undersigned Judge R. BELANGER , in for Martin County, Florida, and

WHEREAS, the Court finds that the affiant has established that other reasonable methods to obtain the evidence sought have either been attempted and failed or are unlikely to accomplish the stated goals of the affiant's investigation, and

WHEREAS, said facts made known to and considered by me have caused me to certify and find that the facts set forth in said affidavit show and constitute probable cause for the issuance of this surveillance warrant, and the Court being satisfied of the existence of said grounds set forth in the affidavit in that on or in a certain premises known and described as follows:

TO WIT: Start at the intersection of SE Federal Hwy and SE Indian Street. Travel north on SE Federal Hwy from the intersection for approximately .32 miles which leads to the intersection of SE Federal Hwy and SE Luckhardt St. After reaching the intersection, turn left (west) on SE Luckhardt St and an entrance into a commercial plaza is located on the immediate right (north) side of SE Luckhardt St. After turning into the plaza the address numbers of 2836 are displayed on the building at the location of the business. The business is located between other business in a commercial business building that are all under one roof but each business has its own individual address at/near the entrance to them. The businesses are divided by interior walls. The entrance to Florida Therapy Spa faces east. The numbers 2836 are affixed near the entrance to the business. The exterior of the building is painted tan in color with windows allowing view into the entrance to the business. The roof is tan in color made of barrel tile. A sign located on the wall over the business entrance has the lettering "THERAPY SPA" displayed. When facing the business, there are two front doors that meet in the middle. The doors are hinged on the left and right sides allowing one to open outward from left to right and the other to open outward from right to left. A photo of the premises is shown below.

*Exhibit "1"*

The premises and curtilage occupied by or under the control of a Ruimei R. Li and Lixia Zhu, and others at this time unknown and there is evidence of active prostitution being performed at the premises to be entered, which is in violation of the Laws of the State of Florida prohibiting prostitution and person(s) deriving support from the proceeds of prostitution, in violation of Chapter 796, Florida Statutes, and of Money Laundering in violation of Chapter 896.

NOW THEREFORE, you, with proper and necessary assistance, are hereby commanded in the name of the State of Florida, in the daytime or in the nighttime, or on Sunday, to enter the said premises 2836 SE Federal Hwy, Stuart, FL, to enter and install in the premises to be searched video surveillance cameras, and to monitor these surveillance cameras for a period of no longer than 30 days, and forthwith make return of your doings upon executing this warrant, which you are hereby commanded to execute as the law directs within ten days from the date thereof. While monitoring the premises to be searched, the Sheriff shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit. The Sheriff shall also make efforts to minimize the disclosure of this surveillance operation to only those sworn law enforcement officers pertinent and relevant to this surreptitious investigation and those sworn law enforcement officers involved in the operation shall be explained this Order as well as the Florida Statute pertaining to Contempt of Court.

The original of this warrant, together with the original inventory shall be returned and filed with the County Judge in and for Martin County, or before any Court having jurisdiction as stated above within ten days of the date of issuance of this warrant.

The Court finds that a copy of this Order need not be left at the premises to be searched because leaving the order at the premises would defeat the purposes of this warrant.

WITNESS my hand and seal this ___ day of _November_, 2018.

JUDGE in and for
Martin River County, Florida

IN THE COUNTY COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY, FLORIDA

STATE OF FLORIDA

                                    Case No.  19-458-MM

-VS-

JOHN CHERVENY

           Defendant(s)

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

THIS CAUSE, having come before the court at the Defendant's Motion to Suppress evidence gathered from the Order for Surreptitious Entry and Installation of Surveillance Camera, and the court having reviewed and applied the relevant caselaw, grants the Defendant's Motion to Suppress.

On April 24, 2019, the court heard testimony and arguments of counsel on the Defendants' Motions to Suppress the covert surveillance evidence obtained pursuant to a circuit court order.  Counsel for the Defendants and the Assistant State Attorneys also presented memorandums of law and caselaw in support of their positions.  This court has had the opportunity to read the memorandums as well as the associated caselaw, and it is clear that great deference is to be given to the approving magistrate's decision to sign the search warrant. *State v. Abbey,* 28 So.3d 208 (Fla. 4th DCA 2010)  With that recognition, assuming *arguendo* that all other arguments made by defense counsel were without merit, the motion to suppress must be granted because of the fatal flaw in the execution.

At the outset, this court must address the issue of standing.  While the State has asserted in its memorandum that the Defendant did not have standing to challenge the search warrant, the court finds without question that he does.  Defense counsel stipulated to the fact that his client was indeed the male seen in the surveillance video, which depicts sexual activity between the defendant and a female.   Identity is not a question that this court need decide as that fact has

1

*Exhibit "2"*

been stipulated to by the Defendant. The State's memorandum also challenges the Defendant's assertion as to standing, arguing that the Defendant has no reasonable expectation of privacy in a massage room. The State correctly conceded in the closing argument that there was an expectation of privacy in this instance and therefore the question as to whether the Defendant has standing is answered in the affirmative.[1]

In order for the government[2] to covertly monitor by hidden camera potential criminal activity and gather evidence for prosecution, the federal courts have followed the precedents established for other search techniques to balance the instrusive nature of a video surveillance with the government's use of these methods for effective means to keep the citizenry safe from criminal elements. *United States v. Mesa-Rincon* 911 F.2d 1433 (10th Cir.1990)

---

1 The State cannot possibly maintain that a person does not have an expectation of privacy in a massage room because the spa is a business open to the public.   A bathroom stall in a restaurant does not become open to surveillance by law enforcement any more than a dressing room in a department store merely because the front doors are unlocked to allow the public to come inside the establishment. While the expectation of privacy may be less than that of the marital bedroom, it does not mean that persons do not have a reason to believe that the activities inside those areas are private and safe from public view.   The State's reliance on *State v. Conforti*, 688 So.2d 350 (Fla. 4th D.C.A. 1997) is misplaced.  Not only does the *Conforti* case address First Amendment, not Fourth Amendment issues, it also involves an entirely different fact pattern.  In *Conforti*, the State, through its undercover agent, was invited into the private room where the criminal act took place in his presence. *Id. at 358.*  In this case, however, the State was not invited into the massage rooms, but gained covert access through the use of a search warrant. So while the magistrate determined that the expectation of privacy could be breached by warrant for the probable cause he found within the affidavit, it does not mean that the privacy expectation does not exist.
2 "Government" is being used in this context as the federal government.  There is no Florida law or statute that specifically authorizes covert video surveillance and both sides point to federal rules, laws, and caselaw in support of their respective arguments.  This court again gives great deference to the signing magistrate as to the authority of the state action and recognizes that video surveillance, when properly performed can be an exceedingly useful investigative tool.  However, with no guiding Florida guidance in rule, law, or caselaw, by necessity this court turns to federal authority, which ironically also points out that there is no clear Congressional action as it relates to video surveillance. *United States v. Mesa-Rincon* 911 F.2d 1433 (10th Cir. 1990); *United States v. Koyomejian*, (9th Cir. 1991)

A magistrate shall issue an order permitting video surveillance only when:

    (1)    there has been a showing that probable cause exists that a particular person is committing, has committed, or is about to commit a crime;

    (2)    the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment;

    (3)    the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation;

    (4)    the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to succeed if tried or appear to be too dangerous; and

    (5)    the order does not allow the period of interception to be longer than necessary to achieve the objection of the authorization, or in any event longer than thirty days.

*Mesa-Rincon* 911 F.2d at 1436.

Both sides argued at great lengths over whether the order satisfied the requirements of the issuance of the warrant; however, the crux of the issue for this court is **how** the order was executed. The order requires that law enforcement minimize the monitoring activities. Law enforcement recognizes this in their Minimization Instructions which were introduced into evidence. The minimization requirements were not met in the execution of the order.

There were a total of four defendants who had similar motions to suppress pending that were addressed at the hearing. The defendants visited one of two businesses that were under surveillance by the Sheriff's Office. During the hearing, they were referred to as either the "Bridge Spa" or the "Therapy Spa" depending on which business and defendant was referenced. Each affidavit, signed order by the magistrate, and Minimization Instruction memo was identical except for the identification and description of the business being referenced, and each of those was introduced into evidence as State's Exhibits without objection by each defendant. The lead detective prepared the affidavit as well as the order with the help of the State Attorney's Office. The detective prepared the probable cause in the affidavit in large part himself, but the paperwork was a coordinated effort between the two agencies. This affidavit contains an assertion that the affiants have strongly considered the parameters and requirements established by the *Mesa-*

3

*Rincon* court and assure the magistrate that the guidelines have been met. *See State Exhibit 3, page 26 of 29 of the affidavit.*

With the signed Order for Surreptitious Entry and Installation of Surveillance Camera, law enforcement proceeds to install the surveillance equipment at the Bridge and Therapy Spas. The detective testified that both the Bridge Spa and the Therapy Spa are licensed for the legitimate services provided, that is, massages. The massage rooms themselves are closed door rooms: a client is led to the room, the therapist leaves the client in the room, closes the door behind her, and the client is to get undressed and lay on the massage table. There are drapes to cover the body once on the table. After a time the therapist comes back into the room, shutting the door. There is a camera installed at the front desk where the clients check in and pay for services from the "board" or "menu" that lists legitimate services. There are cameras also installed in each of the closed door massage rooms.

With the cameras installed, law enforcement begins the surveillance of the business. "Surveillance" however might be a stretch. While the defense took issue with whether "monitor" meant "record," the issue becomes the lack of monitoring that was conducted. Once the cameras were installed, they were set to record all of the events on all of the cameras during business hours. Sometimes a member of law enforcement was monitoring the activities in "live" time, but at no point during the investigation were the cameras ever turned off. Indeed, all of the data collected is being housed on a server at the Sheriff's Office. While this did capture the events and activities in which these defendants were involved, it also captured and collected events of the otherwise innocent clients that went in for legitimate services, all unaware that they were being watched. This violates the minimization requirements in two important ways.

First, law enforcement ensured the magistrate in the affidavit for application of the Surveillance Order that the affiants had "strongly considered" the restraints of the *Mesa-Rincon* case. The detective confessed he had not read the case and was relying upon the Assistant State Attorney for guidance. Had he read the case, he would have known that the Mesa-Rincon court established the safeguards to avoid "recording of activity by persons with no connection to the crime under investigation who happen to enter an area covered by a camera." *Mesa-Rincon* 911 F.2d at 1441. Those with "no connection to the crime under investigation" would be the innocent person who had come in for a legitimate service, and because he or she was there during

regular business hours for the two weeks to thirty days that the recordings were made, has had their activities in that massage room, including undressing and being seen either partially or completely unclothed not only recorded, but collected and saved on a server.   By the detective's estimation, that would be about 45 people between the two spas.   There was no effort made to minimize the monitoring or recording of innocent activity.   The detective believed that minimization had been achieved by the Minimization Memo, the placement of the cameras, the time duration of limiting by two weeks from thirty days, and monitor only during business hours.   But this ignores completely that activity of innocent parties was recorded from start to finish in a separate room.   To be sure, perhaps illicit conduct was occurring in the room next door; but there was no effort made to separate and monitor only the illicit activity. Indeed, the innocent client was treated the same by law enforcement as the criminal element they sought to capture.

Secondly the Minimization Memo, memorialized in State's Exhibits 1 and 2 was not followed.   The minimization memo requires that surveillance monitoring will be conducted for a reasonable period until it is determined that no criminal conduct will be conducted.   When that determination is made, the surveillance is to be terminated.   *State Exhibit 1 and 2, paragraph 3.* To emphasize this requirement, paragraph 4 states that if criminal conduct is being surveilled, it will be monitored and recorded.[3]   While it does not appear that the minimization memo was presented to the magistrate, it was prepared as instruction to the conduct of the investigation.   It was not followed.   At the very least, it would have required that when it was determined that no illegal activity was happening in the massage room, the monitoring or recording was turned off when the client began to dress after the massage was concluded.   At no time was any effort made to stop the monitoring or recording **at any point** to protect the innocent person who happened to enter an area covered by a camera.

The detective testified that minimization was achieved by not putting cameras in the "personal areas" that is the living areas or bathrooms and by only recording for two weeks rather than the full thirty days that was allowed by the surveillance order, and only recording during business hours.   While these may be factors in the minimization, the blanket storing of all surveillance of all rooms at all times, regardless of the activities occurring within them falls far

---

3 The Defendant is correct in the assertion that the language of the Order allows for "monitoring" but does not provide for "recording."  Oversight, scrivenor's error, or something more insidious is not at issue here as it pertains to "monitor" or "record." Neither were done in accordance with the caselaw nor the Minimization Memo.

short of the minimization requirements required to protect innocent activity of innocent people who happen to come under the camera's eye.

The use of video surveillance and monitoring is an extraordinarily intrusive method of searching for evidence of criminal activity.   The difference between surveillance and video surveillance is akin to the difference between pat down search and strip search. *Mesa-Rincon* 911 F.2d at 1442.   Because of its highly intrusive nature, the requirements to curtail what can be captured must be scrutinized and high levels of responsibility must be met to avoid the intrusion on the activities of the innocent.   These strict standards were simply not met in this case.   There was no effort made to avoid capturing innocent activity behind the closed door of a massage room.   There is no other remedy but to suppress the evidence gathered.

It is hereby ORDERED AND ADJUDGED

The Defendant's Motion to Suppress is granted.   Any evidence gathered as a result of the Order for Surreptitious Entry and Installation of Surveillance Camera is prohibited from use in the prosecution of this cause.

DONE AND ORDERED in Martin County, Stuart, Florida this ___1___ day of May, 2019.


KATHLEEN H. ROBERTS
COUNTY COURT JUDGE

CC: Office of the State Attorney, SA19eservice@sao19.org
      Law Offices of Kibbey and Wagner, counsel for the Defendant

6

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**ROBERT KRAFT,**
Appellee.

No. 4D19-1499

_____

**STATE OF FLORIDA,**
Appellant,

v.

**ROBERT FREELS,** et al,
Appellees.

Nos. 4D19-1655, 4D19-1656, 4D19-1657, 4D19-1658, 4D19-1659, 4D19-1660, 4D19-1661, 4D19-1662, 4D19-1663, 4D19-1664, 4D19-1665, 4D19-1666, 4D19-1667, 4D19-1668, 4D19-1669, 4D19-1670, 4D19-1671, 4D19-1672, 4D19-1673, 4D19-1674, 4D19-1675, 4D19-1676, 4D19-1677, 4D19-1678, 4D19-1679, 4D19-1680, 4D19-1681, 4D19-1682, 4D19-1683, 4D19-1684, 4D19-1685, 4D19-1686, 4D19-1687, 4D19-1688, 4D19-1689, 4D19-1690, 4D19-1691, 4D19-1692, 4D19-1693, 4D19-1694, 4D19-1695, 4D19-1696, 4D19-1697, 4D19-1698, 4D19-1699, 4D19-1700, 4D19-1701, 4D19-1702, 4D19-1703, 4D19-1704, 4D19-1705, 4D19-1706, 4D19-1707, 4D19-1708, 4D19-1709, 4D19-1710, 4D19-1711, 4D19-1712, 4D19-1713, 4D19-1714, 4D19-1715, 4D19-1716, 4D19-1717, 4D19-1718, 4D19-1719, 4D19-1732, 4D19-1733, 4D19-1734,4D19-1735, 4D19-1736, 4D19-1737, 4D19-1738, 4D19-1739, 4D19-1740, 4D19-1741, 4D19-1742, 4D19-1743, 4D19-1744, 4D19-1745, 4D19-1746, 4D19-1747, 4D19-1748, 4D19-1749, 4D19-1750, 4D19-1751, 4D19-1752, 4D19-1753, 4D19-1754, 4D19-1755, 4D19-1756, 4D19-1757, 4D19-1758, 4D19-1759, 4D19-1760, 4D19-1761, 4D19-1762, 4D19-1763, 4D19-1764, 4D19-1765, 4D19-1766, 4D19-1767, 4D19-1768, 4D19-1769, 4D19-1770, 4D19-1771, 4D19-1772, 4D19-1773, 4D19-1774, 4D19-1775, 4D19-1776, 4D19-1777, 4D19-1778, 4D19-1779, 4D19-1780, 4D19-1781,

*Exhibit "3"*

4D19-1782, 4D19-1783, 4D19-1784, 4D19-1785, 4D19-1803, 4D19-1804, 4D19-1805, 4D19-1806, 4D19-1807, 4D19-1808, and 4D19-1809

_____

**STATE OF FLORIDA,**
Appellant,

v.

**HUA ZHANG, LEI WANG, LEI CHEN,** and **SHEN MINGBI**
Appellees.

No. 4D19-2024

[August 19, 2020]

Consolidated appeals and cross-appeals of nonfinal orders from the County Court for the Fifteenth Judicial Circuit, Palm Beach County; Leonard Hanser, Judge; L.T. Case Nos. 50-2019-MM-002346-AXXX-NB and 50-2019-AP-000074-AXXX-MB; the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Joseph G. Marx, Judge; L.T. Case Nos. 50-2019-CF-001606-AXX-MB, 50-2019-CF-001606-BXX-MB, 50-2019-CF-001606-CXX-MB, and 50-2019-CF-001606-DXX-MB; and the County Court for the Nineteenth Judicial Circuit, Indian River County; David C. Morgan and Nicole P. Menz, Judges; L.T. Case Nos. 312019MM000328A, 312019MM000330A, 312019MM000333A, 312019MM000334A, 312019MM000335A, 312019MM000336A, 312019MM000337A, 312019MM000338A, 312019MM000339A, 312019MM000340A, 312019MM000342A, 312019MM000343A, 312019MM000345A, 312019MM000347A, 312019MM000348A, 312019MM000350A, 312019MM000352A, 312019MM000353A, 312019MM000354A, 312019MM000355A, 312019MM000357A, 312019MM000358A, 312019MM000359A, 312019MM000361A, 312019MM000363A, 312019MM000365A, 312019MM000366A, 312019MM000367A, 312019MM000368A, 312019MM000369A, 312019MM000371A, 312019MM000372A, 312019MM000373A, 312019MM000376A, 312019MM000378A, 312019MM000379A, 312019MM000383A, 312019MM000384A, 312019MM000385A, 312019MM000387A, 312019MM000389A, 312019MM000391A, 312019MM000392A, 312019MM000393A, 312019MM000394A, 312019MM000395A, 312019MM000397A, 312019MM000398A, 312019MM000399A, 312019MM000400A, 312019MM000402A, 312019MM000404A, 312019MM000405A, 312019MM000406A,

2

312019MM000407A,    312019MM000409A,    312019MM000410A,
312019MM000411A,    312019MM000412A,    312019MM000413A,
312019MM000415A,    312019MM000417A,    312019MM000419A,
312019MM000420A,    312019MM000421A,    312019MM000422A,
312019MM000424A,    312019MM000426A,    312019MM000428A,
312019MM000432A,    312019MM000433A,    312019MM000434A,
312019MM000435A,    312019MM000436A,    312019MM000438A,
312019MM000440A,    312019MM000441A,    312019MM000442A,
312019MM000443A,    312019MM000445A,    312019MM000446A,
312019MM000447A,    312019MM000449A,    312019MM000450A,
312019MM000451A,    312019MM000452A,    312019MM000453A,
312019MM000454A,    312019MM000455A,    312019MM000456A,
312019MM000458A,    312019MM000459A,    312019MM000461A,
312019MM000462A,    312019MM000463A,    312019MM000465A,
312019MM000466A,    312019MM000470A,    312019MM000471A,
312019MM000474A,    312019MM000475A,    312019MM000476A,
312019MM000477A,    312019MM000478A,    312019MM000480A,
312019MM000481A,    312019MM000483A,    312019MM000484A,
312019MM000490A,    312019MM000491A,    312019MM000492A,
312019MM000493A,    312019MM000495A,    312019MM000496A,
312019MM000497A,    312019MM000502A,    312019MM000554A,
312019MM000556A,    312019MM000560A,    312019MM000561A,
312019MM000562A,    312019MM000572A,    312019MM000587A,
312019MM000588A,    312019MM000591A, and 312019MM000668A.

Ashley Moody, Attorney General, Amit Agarwal, Solicitor General, and Jeffrey Paul DeSousa, Deputy Solicitor General, Tallahassee, for appellant.

Derek L. Shaffer, William A. Burck, and Sandra Moser of Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C., and Alex Spiro of Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, Pro Hac Vice; and Frank A. Shepherd of GrayRobinson, P.A., Miami, for appellee Robert Kraft.

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee; and Andrew B. Metcalf of the Law Offices of Green, Metcalf & Lazan, Vero Beach, for appellees Robert Freels, et al.

Tama Beth Kudman of Tama Beth Kudman, P.A., West Palm Beach, for appellee Hua Zhang.

Kathleen S. Phang of Katie S. Phang, P.A., Coral Gables; Zachary P. Hyman of Berger Singerman LLP, Miami; Christopher N. Bellows and Edward Diaz of Holland & Knight LLP, Miami; William N. Shepherd and

Jeff Schacknow of Holland & Knight, West Palm Beach, for appellee Lei Wang.

Michael S. Brown of the Law Office of Michael S. Brown, PLLC, Orlando, for appellees Lei Chen and Shen Mingbi.

Donnie Murrell, West Palm Beach, Amicus Curiae for Due Process Institute.

David Oscar Markus, National Co-Chair, Amicus Committee, Miami, Amicus Curiae for National Association of Criminal Defense Lawyers.

Andy Thomas, Public Defender, and Justin F. Karpf, Assistant Public Defender, Tallahassee, Amicus Curiae for The Florida Association of Criminal Defense Lawyers.

Leonard Feuer of Leonard Feuer, P.A., West Palm Beach, Amicus Curiae for Professor Stephen A. Saltzburg, Esq. of George Washington University Law School and Professor Ronald Goldstock, Esq. of New York University School of Law.

Harvey J. Sepler of Rimon, P.C., Hollywood, Amicus Curiae for The Independence Institute.

CIKLIN, J.

In these three consolidated cases,[1] the State of Florida appeals trial court orders granting motions to suppress non-audio video surveillance that was recorded with hidden cameras covertly installed inside massage parlors suspected of housing prostitution activity. We find the trial courts properly concluded that the criminal defendants had standing to challenge the video surveillance and that total suppression of the video recordings was constitutionally warranted.

## I.  *Factual Background*

---

[1] This court previously consolidated these three appellate cases (*State v. Kraft*, 4D19-1499, *State v. Freels*, 4D19-1655, and *State v. Zhang*, 4D19-2024) for purposes of resolution by the same panel. After a consolidated oral argument, we now consolidate these cases for purposes of this opinion. In *State v. Freels*, 4D19-1655, this court previously consolidated for all purposes more than 100 related cases raising the same issues.

These cases arise from investigations conducted by three law enforcement agencies on two massage parlors. We summarize the relevant facts of each investigation and the procedural posture leading to these appeals.

### A. *The Jupiter Police Department's Investigation of the Orchids of Asia Day Spa in Jupiter, Florida - Kraft,* 4D19-1499 and *Zhang,* 4D19-2024

Detectives with the Martin County Sheriff's Office were investigating prostitution and possible human trafficking at massage parlors in Martin County. They alerted a Jupiter Police Department detective about the Orchids of Asia Day Spa in the Town of Jupiter because one of Orchids of Asia Day Spa's former employees was allegedly managing the massage parlor being investigated in Martin County.

The Jupiter detective began researching websites that advertise prostitution services and found ads classifying the spa as a massage business where female employees offer a sexual act involving manual manipulation of the male genitals for money.

Jupiter police surveilled the spa for several days and observed more than 100 men enter and remain for 30 to 60 minutes. A few women entered the spa, and they exited soon after, leading the detective to conclude that the female patrons had not obtained prostitution services. The spa kept odd hours, sometimes staying open until midnight.

The detective contacted and shared his concerns with an investigator with the Florida Department of Health, who conducted an annual inspection. During the health inspection, the spa's manager appeared nervous. As the inspector entered rooms containing beds, clothing, a flat iron, and other personal items, the manager tried to cover things with a blanket.

During the health inspection, Jupiter police saw a woman discard something in the dumpster outside the spa. Police pulled trash from the dumpster and retrieved tissues with seminal fluid. Police also found receipts matching a name ("Lulu") seen on one of the illicit massage websites. In furtherance of their investigation, police pulled over four men seen leaving the spa, and each one admitted to the detective that they paid a fee to receive manual stimulation at the end of the massage. Three of the men identified the spa employees that provided the services.

The Jupiter detective then applied for a warrant to install secret, non-audio video cameras in the spa and to monitor and record the video.  A magistrate issued a warrant allowing police to install hidden cameras at the spa in places where prostitution was believed to be occurring and in the lobby.  The warrant prohibited cameras in areas where prostitution was not suspected, such as the kitchen, bathroom, and personal bedrooms.

The warrant allowed non-audio video recording for no more than five days to obtain evidence of prostitution and the felony offense of deriving support from the proceeds of prostitution.  The warrant did not discuss or otherwise direct any police conduct related to "minimization," and the detectives were not given any type of formal written instructions about how to minimize.

Using a phony bomb threat to clear the building, police installed hidden cameras in four of the spa's massage rooms and in the lobby.  Three detectives monitored and recorded video from the hidden cameras over five days.  The cameras recorded video continuously, but Jupiter detectives monitored the video feeds only during business hours.

The detectives toggled between the video feeds when they displayed or when they thought they might soon display criminal conduct.  They focused on the end of the massages because the sexual conduct typically occurred at the end.  In all, police recorded 25 spa customers pay for sexual services.  Ten more customers were suspected to have paid for sex, but the offenses could not be confirmed due to dim lighting.  Four customers, including two women, were recorded who did not engage in illegal activity.

In *Kraft*, 4D19-1499, the appellee was filmed visiting the spa on two occasions and was stopped by the police while driving away after his second visit.  He was later charged with two misdemeanor counts of soliciting prostitution.

In *Zhang*, 4D19-2024, the spa's employees—including the owner (Hua Zhang) and manager (Lei Wang)—were charged with misdemeanor and felony prostitution-related offenses.

Kraft and the spa employees moved to suppress the videos of the prostitution offenses on several grounds.  The county court in Kraft's misdemeanor case granted the motion to suppress because the search

warrant was deficient in failing to set out "minimization"[2] procedures and because police did not sufficiently minimize the recording of conduct outside the scope of the warrant.

Additionally, the county court in Kraft's case certified three questions of great public importance:

a. Does Defendant have standing to raise a Fourth Amendment defense to the Search Warrant Affidavit and Search Warrant, presented in this case? and,

b. Does the Search Warrant satisfy Fourth Amendment requirements? and,

c. Was the Search Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

This court accepted jurisdiction.

Likewise, the circuit court in *Zhang* suppressed the videos on the same grounds, and the state has timely appealed both matters.

### B. The Indian River County Sheriff's Office Investigation of the East Sea Spa in Sebastian, Florida - Freels, 4D19-1655[3]

The Indian River County Sheriff's Office began investigating the East Sea Spa in Sebastian, Florida, after learning that other law enforcement agencies were combating illicit massage businesses in their jurisdictions. A sergeant discovered that the spa had posted ads for sexual services on websites. The assigned sergeant surveilled the business and observed a disproportionate number of men visiting the spa. Many of the men looked around the parking lot suspiciously before entering. One man, a registered

---

[2] The term "minimization" generally refers to warrant guidelines or techniques to be applied by law enforcement agents to narrow, or minimize, the breadth of the activity that is surveilled. *See generally People v. Floyd*, 360 N.E.2d 935, 939-40 (N.Y. 1976) (citing *Berger v. New York*, 388 U.S. 41 (1967)). As will be further discussed in our analysis, the minimization requirement "has its underpinnings in the Fourth Amendment interdiction of unreasonable search and seizures and its mandate that search warrants contain provisions 'particularly describing the place to be searched, and the persons or things to be seized.'" *Id.* at 940.

[3] The appeals in *Freels*, 4D19-1655, concern investigations conducted by two separate law enforcement agencies on the spa at issue. The investigations have distinct facts. The parties were permitted to file separate briefs concerning the two investigations.

sex offender, fled the spa upon seeing a uniformed officer in the parking lot.

The sergeant pulled trash and located tissues with seminal fluid.  He stopped two men leaving the spa, and they admitted that they paid for sexual gratification at the end of the massage.

The sergeant suspected that the female massage workers were living in the spa.  Throughout his surveillance, he never saw the women leave at night and saw them leave just one time to shop at a department store.  A Department of Health inspector conducted an inspection and observed clothing, suitcases, food, bedding, and other indicia that someone was living in the building.

The sergeant applied for a warrant to install hidden, non-audio video cameras in areas where prostitution was believed to be occurring.  A magistrate issued the warrant and authorized monitoring for 30 days.  The warrant instructed the detectives monitoring the video feeds to take steps to minimize the invasion of privacy to customers not engaged in illegal activity.

Law enforcement officials installed hidden cameras in the massage rooms and lobby.  Two detectives monitored the video feeds for nine days over the ensuing 30-day period and recorded 43 acts of prostitution.  Some of the sex acts occurred at the beginning or middle of the massages but most occurred at the end.  When not monitoring the video feeds, the cameras were turned off and did not record.

After installing the cameras, the detectives learned that they could not entirely control the specific video feeds that would be recorded.  They had the option to record none, one, or all four of the massage rooms at the same time.  If two men were receiving illegal massages in rooms 1 and 2, and a woman entered room 3 for a legal massage, the detectives could not record the men without also recording the woman's spa services.

Police opted to continue recording under these circumstances, and as a result, four women were recorded receiving lawful massages.  The detectives would toggle to the video of the suspect massages and take the women's massages off-screen.  The women's massages were recorded but not viewed.  When only one man was receiving an illegal massage, the detectives turned off the recording of the woman's massage.  If only a woman was in the spa, they would stop recording altogether.

After the 30-day period expired, the detectives obtained a second warrant for another 30 days and monitored the video feeds for four more days. During the 13 days the cameras were monitored, police recorded a total of 67 massages and 63 of them involved prostitution. Every man that entered the spa paid for sexual services. Up to ten women received lawful massages during this span, and, as noted, four were recorded. The recordings were stored on a secure server that only the detectives could access.

The state brought misdemeanor solicitation of prostitution charges against numerous men recorded in the videos. The owner of the East Sea Spa is being prosecuted on felony charges in *Zhang*.[4]

The defendants moved to suppress the videos on several grounds. The county court judge suppressed the videos because law enforcement failed to minimize the intrusion on the privacy rights of law-abiding spa-goers and the warrant provided no written criteria for minimization. The judge noted the disturbing fact that innocent women were recorded in various stages of undress while receiving lawful massages.

The county court certified four questions of great public importance:

a. Did the Defendant have a legitimate expectation of privacy such that he is entitled to claim the protection of the Fourth Amendment? and,

b. Did the issuing Court have authority under the Fourth Amendment to authorize a Video Surveillance Warrant? and,

c. If the issuing Court had the power to authorize a Video Surveillance Warrant, does the Video Surveillance Warrant issued in this case satisfy Fourth Amendment requirements? and,

d. If the issuing Court had the power to authorize a Video Surveillance Warrant and the Warrant satisfied Fourth Amendment requirements, was the Video Surveillance Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

---

[4] Police believed that at least one of the workers at the spa was a victim of human trafficking although no such charges have been brought to date.

This court accepted jurisdiction.

### C. *The Vero Beach Police Department Investigation of the East Sea Spa in Sebastian, Florida - Freels, 4D19-1655*

The Vero Beach Police Department began investigating the East Sea Spa after receiving citizen complaints that prostitution might be occurring there. A detective reviewed adult websites with ads showing the spa offered prostitution services. The detective discovered that the spa's manager, Lanyun Ma, who is also the wife of the spa's owner, had been arrested for prostitution and human trafficking offenses in New York and Massachusetts. She pleaded guilty to prostitution offenses in those cases.

An undercover detective visited the spa posing as a client. After the massage, the masseuse touched his groin and offered sexual activity for money. The detective made up an excuse and declined the offer, but on his second visit, the masseuse grew suspicious and accused him of being "police." The detective leading the investigation opted against further undercover operations to avoid tipping off the spa.

Police pulled over two men seen leaving the spa, and both agreed to speak with the officers and reported experiences similar to the undercover detective's.

Police surveilled the spa and learned that the massage workers lived in the building and did not leave at night. When workers did leave the spa, they did so only under the spa manager's supervision. The spa's clientele was "exclusively male," and no female clients were seen during a three-week period.

Trash pulls produced napkins with seminal fluid, used condoms, and a package for a sex toy.

A magistrate issued a warrant for non-audio video surveillance inside the spa for no longer than 30 days. The warrant instructed detective-monitors to "take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit."

Law enforcement officials installed hidden cameras and used them to monitor and record spa customers as they undressed and received massages in private massage rooms. For the first 20 days, two detectives monitored the video feeds from 8 a.m. to 11 p.m. The cameras, however, recorded for the full 30 days. Police observed nearly 100 sex acts during this period. The recordings made while the detectives were not monitoring

the feeds had not been viewed by anyone.  The video is stored on a hard drive in the police department's evidence lockup.

The lead detective applied for an extension of the 30-day surveillance period, noting that police had witnessed the counting of large sums of money and women being transported to and from the spa.  The spa's manager and a man named Kenneth Zullo had brought new massage workers to the spa.  The women would stay at the spa for several days or weeks before being moved to a different location.  Every woman transported to the spa engaged in prostitution there.

A judge approved an extension of the warrant and again instructed police to minimize the intrusion on lawful activity.  Detectives monitored the video feeds for 10 additional days.

In total, police monitored the video feeds for 30 out of the 60 possible days.  Of the 145 monitored massages, 142 involved an act of prostitution.  Two of the men who appeared to have received non-criminal massages had received prostitution services on other visits to the spa.  Only one man monitored and recorded by police was not seen receiving sexual services.

Most of the prostitution occurred at the end of the massage (83 times) but on some occasions (59 times) the massages began with the act of prostitution.  This complicated efforts to minimize because, if the detectives did not monitor the beginning of the massages, they may have missed an act of prostitution.

Numerous defendants were charged with misdemeanor counts of soliciting prostitution.  One of the massage workers told police that she committed the acts against her will and was in fear.  Police suspected that at least one individual was a victim of human trafficking.

The defendants in the misdemeanor cases moved to suppress the videos on many grounds.  The county court suppressed the videos, concluding that police failed to minimize the intrusion on the privacy of individuals not engaged in unlawful activity.  The court noted that, while police monitored the feeds only 50% of the allowed time, the cameras recorded for the entire 60 days.  Although only three lawful massages were monitored, the court suspected that more innocent spa clients may have been recorded.

The county court certified the same four questions set out in the discussion of the Indian River County Sheriff's Office's investigation. This court accepted jurisdiction.[5]

## II. Standard of Review

> The trial court's ruling on a motion to suppress comes to the appellate court with a presumption of correctness, and the court must interpret the evidence, inferences and deductions therefrom in favor of sustaining the trial court's ruling. *Pagan v. State*, 830 So. 2d 792, 806 (Fla. 2002). While the appellate court is bound by factual determinations which are supported by competent substantial evidence, it reviews mixed questions of fact and law *de novo. Cote v. State,* 14 So. 3d 1137, 1139 (Fla. 4th DCA 2009).

*Kelly v. State*, 77 So. 3d 818, 821 (Fla. 4th DCA 2012).

## III. Analysis

On appeal, the state argues that the trial courts erred in suppressing the video evidence because (1) the defendants lack standing to raise a Fourth Amendment challenge, (2) the warrants were not deficient because minimization is not a requirement under the Fourth Amendment, and (3) even if the warrants were deficient, the "good faith" exception to the exclusionary rule should apply. As we explain below in addressing each of these three arguments, we disagree. In the absence of any binding Florida law concerning silent video surveillance like that conducted in this case, the trial courts properly applied well-settled and persuasive federal law on the issue.

### A. The Defendants Have Standing to Raise a Fourth Amendment Defense

Our analysis begins with the Fourth Amendment's prohibition on unreasonable searches, which protects individual privacy against certain types of government intrusion:

---

[5] The defendants in *Freels*, 4D19-1655, filed notices of cross-appeal and have argued alternative bases to support the suppression orders. Our jurisdiction to review the defendants' appeals from the trial courts' non-final rulings is questionable. Defendants have essentially argued "tipsy coachman" grounds for affirmance. In this opinion, we do not decide the issues argued in the cross-appeals as it is not necessary to do so.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Amend. IV, U.S. Const.

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he [or she] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States,* 389 U.S. 347, 351 (1967). Thus, to establish standing to raise a Fourth Amendment violation, a defendant must demonstrate a legitimate expectation of privacy in the area searched or the item seized. The inquiry involves two distinct questions: (1) whether the individual has "exhibited an actual (subjective) expectation of privacy" – i.e., whether the individual has shown that he or she seeks to preserve something as private; and (2) whether the subjective expectation of privacy is one that society recognizes as reasonable – i.e., whether the expectation is objectively "justifiable" under the circumstances. *Smith v. Maryland,* 442 U.S. 735, 740 (1979) (quoting and applying *Katz* as the Court's "lodestar" for whether a particular form of government-initiated electronic surveillance is a search within the meaning of the Fourth Amendment). "Consistently with *Katz,* this court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith,* 442 U.S. at 740.

The spa-client defendants in all of these cases had a subjective and objectively reasonable expectation of privacy in the massage parlor rooms. The surveillance took place in a professional private setting where clients are expected to partially or fully disrobe. The spa owners and their employees also had a reasonable right to expect that the interactions with nude or partially nude clients in the massage rooms would not be exposed to the public. As soon as the door to the massage room was closed, they had a reasonable expectation of privacy. *See Katz,* 389 U.S. at 351 ("[W]hat he [or she] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); *Ramirez v. State,* 654 So. 2d 1222, 1223 (Fla. 2d DCA 1995) ("As soon as Ramirez entered the closed toilet stall he had a legitimate expectation of privacy . . . ."). Thus, the business owner, workers, and clients have standing to challenge the subject searches.

Florida statutory law further lends support to our conclusion that the defendants enjoyed a legitimate expectation of privacy in the massage rooms. While Florida has no statute that expressly addresses warrants for surreptitious, video-only surveillance by police, the Florida Legislature has recognized a legitimate expectation of privacy in this type of location in at least two statutes. Florida's statute defining the offense of video voyeurism defines when a person has a reasonable expectation of privacy:

> "Place and time when a person has a reasonable expectation of privacy" means *a place and time when a reasonable person would believe that he or she could fully disrobe in privacy, without being concerned that the person's undressing was being viewed, recorded, or broadcasted by another*, including, but not limited to, the interior of a residential dwelling, bathroom, changing room, fitting room, dressing room, or tanning booth.

§ 810.145(1)(c), Fla. Stat. (2019) (emphasis added). Likewise, as noted by the trial court in *Kraft*, section 877.26, Florida Statutes (2019), prohibits merchants from "observ[ing] or mak[ing] use of video cameras or other visual surveillance devices to observe or record customers in the merchant's dressing room, fitting room, changing room, or restroom *when such room provides a reasonable expectation of privacy*." (Emphasis added).

These laws clearly undermine the state's argument that the defendants lacked standing because they had, at most, a diminished expectation of privacy in a business open to the public. As is long settled, "[t]he Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351 (rejecting the "trespass doctrine" espoused in past cases like *Olmstead v. United States*, 277 U.S. 438, 464 (1928), which had limited the Fourth Amendment to searches and seizures of tangible property, and holding that attaching a listening device to the outside of a public phone booth was a search that violated the Fourth Amendment).

The state also argues that the spas were primarily used as a brothel, as most of the customers who were recorded and monitored engaged in unlawful activity, and thus, the state asserts, the defendants cannot rely on the Fourth Amendment rights of third parties who had their innocent conduct recorded. However, as case law shows us, Fourth Amendment rights are nearly always safeguarded by those who are criminally prosecuted. *See, e.g., Katz*, 389 U.S. at 348 (reversing judgment of conviction for transmitting wagering information by telephone).

Consequently, the state's circular argument that the defendants lacked a privacy interest because they were engaging in criminal behavior is uncompelling.

The trial courts properly concluded that the defendants had standing to challenge the search.

### B. Minimization Requirements are Applicable to the Surveillance at Hand, and the Requirements were not Properly Defined or Applied

The state next argues that the trial courts erred in determining that adequate minimization procedures were neither defined nor applied because there are no minimization requirements within the text of the Fourth Amendment.

The act of video surveillance itself is perhaps the most intrusive form of electronic law enforcement spying. As the Tenth Circuit held: "The use of a video camera is an extraordinarily intrusive method of searching." *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442 (10th Cir. 1990). "Television surveillance is identical *in its indiscriminate character* to wiretapping and bugging. [However,] [i]t is even more invasive of privacy, just as a strip search is more invasive than a pat-down search . . . ." *Id.* at 1442-43 (alterations and emphasis in original) (quoting *United States v. Torres*, 751 F.2d 875, 885 (7th Cir. 1984)).

Presently there exists no binding Florida statute, Florida decisional law, or rule of criminal procedure that addresses this type of surreptitious, video-only surveillance as a law enforcement investigative tool.[6] Likewise, the text of the Fourth Amendment does not expressly reference the term "minimization." As a result of that void, the state maintains that this court need look no further than the plain text of the Fourth Amendment's Warrant Clause "because the existing probable cause and particularity requirements [of the Warrant Clause] amply safeguard protected privacy

---

[6] As the state contends, the electronic video surveillance at issue is not subject to the strictures of Florida's statute governing the security of communications and surveillance (chapter 934, Florida Statutes – Florida's "wiretapping statute") because the video cameras did not record audio. Chapter 934 protects the privacy of and restricts the interception of "wire and oral communications." § 934.01(2), Fla. Stat. (2019). In *Minotty v. Baudo*, 42 So. 3d 824, 832 (Fla. 4th DCA 2010), an appeal from a civil judgment for damages under chapter 934, this court held that silent video surveillance was not covered by the act, which applies solely to the interception of wire, electronic, or oral communications.

interests." However, the state's argument ignores many years of clear federal jurisprudence on this issue.

"[G]eneral fourth amendment requirements are still applicable to video surveillance; and suppression is required when the government fails to follow these requirements." *Mesa-Rincon*, 911 F.2d at 1437. In *Mesa-Rincon*, the Tenth Circuit rejected arguments that the district court lacked authority to authorize a search via silent video surveillance and that the warrant application did not satisfy Fourth Amendment requirements. *Id.* at 1446. In consideration of "the underlying purposes of the fourth amendment and the intrusiveness of video surveillance," the Tenth Circuit adopted "five requirements for video surveillance that define more specifically the probable cause and particularity requirements of the fourth amendment," and which requirements expressly include the minimization requirement:

> An order permitting video surveillance shall not be issued unless: (1) there has been a showing that probable cause exists that a particular person is committing, has committed, or is about to commit a crime; (2) the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment; (3) *the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation*; (4) the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous; and (5) the order does not allow the period of interception to be longer than necessary to achieve the objective of the authorization, or in any event no longer than thirty days.

*Id.* at 1437 (emphasis added).

The test derives from U.S. Supreme Court case law setting forth "the minimum constitutional standards" for secret audio surveillance. *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir. 1986) (applying the minimum constitutional standards required for audio surveillance set out in *Katz*, 389 U.S. at 354–59, and *Berger v. New York*, 388 U.S. 41, 58-59 (1967), to video surveillance). "Given the obvious similarities between aural and video electronic surveillance, we believe that the same constitutional standards governing the former should be applied in determining whether or not to authorize the latter." *Biasucci*, 786 F.2d at 510. The *Mesa-Rincon* formulation of the test has been expressly adopted and applied by other federal circuit courts of appeal. *E.g.*, *United States v.*

*Falls*, 34 F.3d 674, 680 (8th Cir. 1994); *United States v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992).

Notably, the warrant applications in the cases now on appeal cited *Mesa-Rincon* and sought to comply with its requirements.

Thus, it is clear that federal law has been sufficiently developed on this constitutional issue, and it is clear the trial courts did not err in determining that minimization is required. Indeed, the state's argument for a strict textual reading of the Fourth Amendment runs counter to decades of case law from the U.S. Supreme Court, such as *Berger*, 388 U.S. at 51, where the Court recognized that it had receded from the strict textual approach that was applied in *Olmstead*, 277 U.S. 438. "Statements in [*Olmstead*] that a conversation passing over a telephone wire cannot be said to come within the Fourth Amendment's enumeration of 'persons, houses, papers, and effects' have been negated by our subsequent cases . . . ." *Berger*, 388 U.S. at 51. Should there be any doubt, as the state respectfully urges, that minimization procedures "are not *constitutionally* required by the Fourth Amendment" (emphasis in original), we hereby find they are and caution that to hold otherwise would be directly counter to the Constitution, civil liberties, and the rule of law.

We likewise uphold the trial courts' conclusions that the warrants failed to contain sufficient minimization guidelines and that police did not sufficiently minimize the video recording of innocent spa goers receiving lawful massages. "The purpose of the minimization requirement is to avoid the recording of activity by persons with no connection to the crime under investigation who happen to enter an area covered by a camera." *Mesa-Rincon*, 911 F.2d at 1441. "The minimization question is one of reasonableness." *Id.* (quoting *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir. 1987)).

The warrants at issue did not set forth any specific written parameters to minimize the recording of innocent massage seekers, and law enforcement did not actually employ sufficient minimization techniques when monitoring the video or deciding what to record. In all the investigations, some innocent spa goers were video recorded and monitored undressed. There was no suggestion or probable cause to believe that female spa clients were receiving sexual services, yet law enforcement largely failed to take the most reasonable, basic, and obvious minimization technique, which was simply to not monitor or record female spa clients.

17

The most egregious example is the investigation by the Vero Beach Police Department in the *Freels* case where the cameras recorded continuously for 60 days. Thirty days' worth of unmonitored recordings remain in the police department's possession in that case. Other innocent spa clients may have been recorded nude – or partially undressed – on those days. Those innocent clients potentially live with the knowledge that nude videos of themselves are preserved on a server somewhere with unknown accessibility. In our ever increasingly digital world filled with hackers and the like, such awareness renders the surveillance a particularly severe infringement on privacy.

We agree with the trial courts that this is unacceptable. The trial courts properly applied the federal case law enforcing the minimum constitutional standards for secret video surveillance, and the state has not overcome the presumption of correctness in the trial courts' ruling that the minimization requirement was not satisfied.

### C. Application of the Exclusionary Rule was Proper

Where evidence is obtained in an illegal search and seizure, the Fourth Amendment generally bars its use. *Mapp v. Ohio*, 367 U.S. 643, 648 (1961). "The primary rationale behind the exclusionary rule is to deter law enforcement from violating constitutional rights." *State v. Teamer*, 151 So. 3d 421, 430 (Fla. 2014). But like any good rule, it is not without exception.

The state contends that the "good faith" exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984), should be applied because there was no judicial or statutory authority in Florida requiring minimization. In *Leon*, the Supreme Court declined to apply the exclusionary rule under circumstances that would not further its purpose of deterring unlawful police conduct. *Id.* at 922-23. The Court held that generally "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," there is generally "no police illegality and thus nothing to deter." *Id.* at 920-21. The Court reasoned:

> In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or ... judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the [officer] can do in seeking to comply with the law." [*Stone v. Powell*, 428 U.S. 465, 498 (1976)] (BURGER, C.J., concurring). Penalizing the officer for the magistrate's error, rather than

> his own, cannot logically contribute to the deterrence of
> Fourth Amendment violations.

*Id.* at 921 (first alteration in original) (footnote omitted).  The test under
*Leon* is "whether a reasonably well trained officer would have known that
the search was illegal despite the magistrate's authorization."  *Id.* at 922
n.23.

We cannot conclude here that the law enforcement agencies acted in
good faith with respect to minimization due to the lack of Florida law on
point.  The warrant applications themselves cited the decades-old federal
law (such as *Mesa-Rincon*) setting out the requirements for obtaining a
warrant to conduct secret video surveillance in private locations, including
the need to minimize the recording of innocent conduct.  These citations
negate a finding of ignorance of minimization requirements.

We further reject the state's argument that only recordings of innocent
conduct should be excluded.[7]  In construing the remedy for a failure to
minimize under Florida's wiretapping statute, the Florida Supreme Court
has held:

> [W]here the procedural requirements to minimize interception
> are blat[a]ntly ignored, as we have found them to have been
> in the instant cause, the entire wiretap evidence must be
> suppressed; where violations of the minimization
> requirements occur [d]espite efforts to meet the minimization
> requirements, however, only the unauthorized interceptions
> need be suppressed.

*Rodriguez v. State*, 297 So. 2d 15, 21 (Fla. 1974).

The trial courts did not err in determining that the minimization
requirements were ignored, as opposed to merely being unmet despite
efforts to satisfy them.  As previously discussed, the agencies failed to take
the most basic and reasonable step of minimization by not monitoring or
recording the unsuspected female clients.  We ascribe no ill motives to the

---

[7] The state suggests that the remedy for the innocent spa clients is a civil lawsuit,
like one already pending in federal court.  We disagree.  A costly, time-consuming
civil remedy by unlawfully recorded persons is impractical and would not serve
to meaningfully deter future violations.  Were we to accept this argument, police
in future cases could blatantly violate the privacy rights and Fourth Amendment
protections of citizens and the only consequence would be the risk of future civil
lawsuits that most citizens would not have the wherewithal to pursue.

procedural decisions made by the law enforcement agencies involved. But at best, each department was lulled into a zone of complacency where complacency cannot exist.

Under the facts of this case and guided by the Florida Supreme Court's holding in *Rodriguez,* the trial courts properly suppressed all of the unconstitutionally captured footage. To find otherwise in this context would undermine the purpose of the exclusionary rule—which is to deter future Fourth Amendment violations.

### IV. Conclusion

The type of law enforcement surveillance utilized in these cases is extreme. While there will be situations which may warrant the use of the techniques at issue, the strict Fourth Amendment safeguards developed over the past few decades must be observed. If they are not, any evidence obtained could very well be declared inadmissible as a matter of constitutional law. To permit otherwise would yield unbridled discretion to agents of law enforcement and the government, the antithesis of the constitutional liberty of people to be secure against unreasonable searches and seizures.

The federal case law cited herein pertaining to silent video surveillance is well reasoned and widely accepted. Consequently, we must hold—as every federal circuit court and state court to consider the question has— that this type of intrusive, covert video surveillance is subject to heightened standards and procedures designed to implement Fourth Amendment protections, particularly in the face of the constantly expanding use of electronic surveillance techniques by law enforcement. And where the government fails to faithfully follow these standards and procedures, it will be held to account by the exclusion of the evidence obtained. The Fourth Amendment demands no less under these circumstances.

The trial courts did not err in concluding that total suppression was the appropriate remedy under the circumstances of this case.[8]

---

[8] The parties and amici have argued additional issues and alternative grounds for affirmance that we do not decide as it is not necessary to do so. However, the need for law enforcement use of silent video recording is a matter that could be addressed by the Legislature.

Professors Stephen Saltzburg and Ronald Goldstock present strong arguments in their amicus brief why a warrant authorizing secret video surveillance (a

*Affirmed.*

GROSS, J., concurs.
MAY, J., concurs specially with opinion.

MAY, J., concurring specially.

I concur with the majority. I write to address a single issue raised by the Kraft defense because I believe it lends further support for our decision.

The right to privacy is guaranteed in Florida's Constitution. Art. I, § 23, Fla. Const. Also engrained within Florida's statutory and case law is the prohibition against the use of audio surveillance for prostitution-related offenses. *See* § 934.07, Fla. Stat. (2019); *State v. Rivers*, 660 So. 2d 1360, 1363 (Fla. 1995). These two formidable principles also compel an affirmance in this case.

In his answer brief, Kraft argues Florida provides a statutory basis for the suppression order, thereby avoiding the constitutional issue. *See Delacruz v. State*, 276 So. 3d 21, 26 n.1 (Fla. 4th DCA 2019) (declining to reach constitutional question because the appeal was disposed on other grounds). Specifically, he argues "[n]o Florida statute authorizes surreptitious video surveillance, nor have Florida courts approved it." While the State relies on Chapter 934, Kraft argues that section does not authorize the use of this surveillance type for prostitution-related offenses. *See* § 934.07(1)(a), Fla. Stat. I agree.

First, our legislature had expressly limited audio surveillance "to certain major types of offenses and specific categories of crime." *See* § 934.07, Fla. Stat. Second, our supreme court then held "section 934.07 cannot be read as authorizing wiretaps to investigate *non-violent prostitution-related* offenses without contravening the requirements of" the federal wiretap law. *Rivers*, 660 So. 2d at 1363 (emphasis added). And third, subsequent to *Rivers*, our legislature removed *all* prostitution-related offenses from section 934.07. Ch. 2000-369, § 10, at 8, Laws of

---

"sneak and peak" warrant) has no place in a prostitution case and why the invasive video surveillance conducted here was unnecessary. They make a compelling argument that—as with other electronic surveillance such as wiretapping—the drastic step of installing secret cameras in private locations was intended to be limited to serious crimes and used only as a last resort in extraordinary situations.

Fla (amending § 934.07, Fla. Stat. (1969)).  This ensures that prostitution-related offenses are not considered "major types of offenses" warranting the significant intrusion of one's privacy by audio surveillance.  *Cf. Rivers*, 660 So. 2d at 1362–63.  The video surveillance in this case falls prey to that same limitation.

And while the State clings to section 933.02, Florida Statutes (2019), for life support, that provision's "plain text" simply authorizes a search *warrant* "[w]hen any property shall have been used: . . . [a]s a means to commit any crime."  § 933.02(2)(a), Fla. Stat.  It does not authorize this surveillance type for prostitution-related offenses.  § 933.02, Fla. Stat.

Florida requires strict construction of "statutes authorizing searches." *Morris v. State*, 622 So. 2d 67, 68 (Fla. 4th DCA 1993).  The State must adhere to that mandate.  *See id.*  Because Florida law does not expressly authorize either audio or video surveillance for prostitution-related offenses, the State's warrant was unauthorized and unsupported by Florida case law.

As Professors Stephen Saltzburg, Esq., and Ronald Goldstock, Esq., suggest in their amicus brief:

> The authorization of electronic or video surveillance for petty crimes as a steppingstone in an effort to investigate more serious offenses would make a mockery of the designated crime requirement.  Such a subterfuge would violate the princip[le] that continuous invasions of privacy must be reserved for occasions when the need to do so was critical. . . .  Florida law provides no basis for seeking a warrant for electronic eavesdropping of conversations in a misdemeanor prostitution case, and there is no reason to believe that either the legislature or judiciary would want to permit such warrants when intrusive video surveillance is at issue.
>
> . . . .
>
> The need to limit electronic and visual surveillance to serious crimes is vital if a society continues to value personal privacy and freedom, even as the advance of technology poses unprecedented threats and intrusions. . . .  The development and proliferation of compact, inexpensive, wireless video surveillance technology poses a unique, unprecedented threat to erode the personal privacy against government that Americans have enjoyed since the Founding. . . . And it has allowed the government to "record[] . . . in graphic visual detail

22

. . . very personal and private behavior" like "[n]o other technique" could.   *United States v. Mesa-Rincon,* 911 F.2d 1433, 1442 (10th Cir. 1990).

Lastly, no good-faith exception can save the State's violation of both our statutory and case law limitation of similar types of surveillance.   "The prohibition of [Chapter 934 is] absolute." *Atkins v. State,* 930 So. 2d 678, 682 (Fla. 4th DCA 2006).   "Chapter 934 . . . unequivocally expresses the Legislature's desire to suppress evidence obtained in violation of that chapter. . . ." *State v. Garcia,* 547 So. 2d 628, 630 (Fla. 1989).   Here, when law enforcement invoked Chapter 934, it was on notice that the chapter "cannot be read as authorizing [electronic surveillance] to investigate non-violent prostitution-related offenses." *Rivers,* 660 So. 2d at 1363.   Good faith simply cannot exist in this legal environment.

Neither the Florida statutes, nor case law authorize covert audio surveillance to investigate prostitution-related offenses.   It follows that the more intrusive video surveillance is also prohibited, providing yet another basis for affirmance.

\*          \*          \*

***Not final until disposition of timely filed motion for rehearing.***